UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

RAILWARE, INC.,
Plaintiff,
v.
PENINSULA CORRIDOR JOINT POWERS BOARD D/B/A CALTRAIN,
Defendant.

Case No. 25-cv-05725-BLF

**CLAIM CONSTRUCTION ORDER**

[Re: ECF No. 155]

Railware sued Caltrain for patent infringement. ECF No. 1. Before the Court are the parties' claim construction briefs. *See* ECF Nos. 155, 173, 183. The Court held a technology tutorial and claim construction hearing on October 9, 2026. *See* ECF No. 191. The parties also discussed claim construction at the hearing on October 30, 2026. *See* ECF No. 201. The Court construes the disputed terms as follows.

## I. BACKGROUND

The asserted patents cover systems, apparatuses, and methods to protect railway field workers during track maintenance. *See* U.S. Pat. Nos. 9,517,782 ("the '782 patent"), RE47,835 ("the '835 patent"), RE49,115 ("the '115 patent"). During maintenance, field workers must physically enter the track area. Conventionally, a dispatcher would remotely set a "block" on sections of track under active maintenance. Trains would then be rerouted away from the blocked sections. The dispatcher would remove these blocks when maintenance was complete. But human error meant that blocks were sometimes removed by mistake. This led to field worker injuries and fatalities.

The patents teach providing field workers with a "code" that the dispatcher must receive before removing a block. Simply put, the patents teach partly delegating control over block removal to field workers.

United States District Court
Northern District of California

## II. LEGAL STANDARD

### A. Claim Construction

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g., Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), (Fed. Cir. 1995).

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves to define the scope of the patented invention." *Id.* (cleaned up). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean [including] the words of the claims themselves, the remainder of the specification, the prosecution

history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B. The Level of Ordinary Skill in the Art

A skilled artisan is a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In determining the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, the parties reference skilled artisans throughout their briefs. Railware's expert, Dr. Ahmadian, proposed the following definition:

> It is my opinion that a person of ordinary skill in the art of the Asserted Patents would have (i) at least a bachelor's degree in electrical, mechanical, industrial or related engineering, and (ii) would have had at least two (2) years of experience in railway safety, railway operations, and/or railway control systems. A higher level of education or specific skill might make up for less experience, and vice-versa.

ECF No. 155-5 at ¶ 74.

In contrast, Caltrain's expert, Dr. Kaufman, proposed the following definition:

> I believe a POSITA as of the Priority Date would have had at least a bachelor's degree in electrical, mechanical, or related engineering, and would have had at least two (2) years of experience in railway operations or railway control systems. A higher level of education or skill might make up for less experience, and vice-versa.

ECF No. 173-12 ¶ 82.

Neither party has disputed the others party's definition or challenged the opposing expert's qualifications. In light thereof, the Court adopts the following ordinary skill standard for purposes of this claim construction order: a person having at least a bachelor's degree in electrical, mechanical, industrial, or related engineering, and would have had at least 2 years of experience in railway safety, railway operations, or railway control systems. A higher level of education or skill might make up for less experience, and vice-versa.



United States District Court
Northern District of California

United States District Court
Northern District of California

## III. DISCUSSION

### A. The Code Terms

| Terms | Railware's Proposal | Caltrain's Proposal | Court's Construction |
|---|---|---|---|
| "release code" | "A code for releasing a block on a track that is not readily available to the terminal user (i.e., the dispatcher) to prevent the premature or erroneous release of a block on a track."<br><br>Not indefinite. | "A random code that is not known to the dispatcher."<br><br>Alternatively, it is indefinite. | "A code for releasing a block on a track that is not available to the terminal user (i.e., dispatcher) to release the block, but the code may become available if a releasing event occurs (e.g., the dispatcher receives the code from a railway field worker)." |
| "removal code"<br><br>"secret release code"<br><br>"secret removal code" | "A code for releasing a block on a track that is not readily available to the user of the railway traffic control apparatus (i.e., the dispatcher) to prevent the premature or erroneous release of a block on a track."<br><br>Not indefinite. | "A random code that is not known to the dispatcher."<br><br>Alternatively, it is indefinite. | "A code for releasing a block on a track that is not available to the user of the railway traffic control apparatus (i.e., dispatcher) to release the block, but the code may become available if a releasing event occurs (e.g., the dispatcher receives the code from a railway field worker)." |
| "secret code" | "A code for releasing a block on a track that is not readily available to the user of the railway control apparatus (i.e., the dispatcher) to prevent the premature or erroneous release of a block on a track.<br><br>Not indefinite. | "A random code that is not known to the dispatcher."<br><br>Alternatively, it is indefinite. | "A code for releasing a block on a track that is not available to the user of the railway control apparatus (i.e., the dispatcher) to release the block, but the code may become available if a releasing event occurs (e.g., the dispatcher receives the code from a railway field worker)." |

Both parties agree that the "code" terms should bear the same construction.[1] The parties

[1] The "code" terms appear in various forms across the three asserted patents. The only difference between Railware's constructions is what the "dispatcher," i.e., the human who remotely places and removes blocks on the railway, is called. That is because the dispatcher is referred to by different names in the patents. *See, e.g.*, '782 patent, cl. 5 (referring to the dispatcher as the "terminal user").

United States District Court
Northern District of California

dispute two aspects of what that construction should be.

***First***, the parties dispute whether the codes must be "random." Railware says no because (1) the patents teach codes being random only as examples; and (2) under claim differentiation principles, claim 28 of '115 patent expressly teaches a "secret code" that "is generated by a random process." *See* ECF No. 155 at 13. Caltrain says yes because (1) the patents "repeatedly and consistently describe the code as 'random'"; (2) Railware's expert in another case involving the asserted patents testified that "random" codes are "ultimately what the patents talk about and teach us" while "sequential code generation [is] outside the premise of the patents"; and (3) Railware's claim differentiation argument fails because claim 28 of the '115 patent describes the ***process*** by which the code is generated as being random, not the code itself. *See* ECF No. 173 at 8–9.

The Court begins with the claims. The word "random" appears nowhere in the independent claims. The only time the word "random" is used is in claim 28 of the '115 patent, which expressly teaches a "secret code" that "is generated by a random process." That language strongly suggests the "codes" referred to elsewhere in the claims—at least with respect to the '115 patent—mean something different from a "random code."

The specifications are next. They confirm that Caltrain is wrong. Every single citation Caltrain marshals expressly describes examples or embodiments. *See* '782 patent, 5:58–60 ("The code generator 101B is configured to produce removal code (***such as*** a cipher which is random, pseudo random, secret, etc., and stored on the terminal." (emphasis added)); '115 patent, 6:3–6 (same); '835 patent, 6:6–9 (same); '782 patent, 5:60–64 (referring to the "cipher" previously qualified as an example), 9:32–34 (describing figure 12), 10:14–16 (describing figure 13); '835 patent 9:54–56 (describing figure 12); '115 patent, 9:56–57 (same); *see also* '835 patent, Figs. 4, 10; '115 patent, Figs. 4, 10.

Caltrain's remaining arguments are not convincing. The expert testimony it cites is extrinsic evidence twice over: first because expert testimony is definitionally extrinsic evidence that cannot displace the intrinsic evidence, and second because the expert testimony is not even from this case. And with respect to Caltrain's argument that a "code" that "is generated by a random process" is something different than a "random code," that is, in the Court's view, a distinction without a

difference.

***Second***, the parties dispute whether the code need be "not readily available" to the dispatcher (Railware's construction) or rather "not known" to the dispatcher (Caltrain's construction).

To start, Caltrain's invocations of Railware's statements in *inter partes* review (IPR) proceedings are unavailing. Specifically, Caltrain argues that Railware, in defending its patents in IPRs distinguished prior art on grounds that the prior art taught codes that were "known to the dispatcher" and hence "readily available to the dispatcher." *See* ECF No. 173 at 5 (quoting ECF No. 173-1 at 46, 59, 69–70). Therefore, the argument continues, because a code that was "known" to the dispatcher was "readily available," it follows that the correct construction is a code that is "***not*** known" to the dispatcher. *Id.* (emphasis added). The Court disagrees. As a matter of basic logic, just because a code that is "known" to a dispatcher is also "readily available" does not make the reverse—in that any code that is "readily available" is also "known"—true. *See* ECF No. 183 at 1. Moreover, as Railware explains, "[t]here very well may be other situations . . . where the code may become 'known' to the dispatcher . . . but it would [not] be considered '[] readily available.'" ECF No. 183 at 1.

The reason Railware wants the "not readily available" language is to avoid reading out a failsafe or back-door described in the specifications of the asserted patents. *See* ECF No. 155 at 13–14. This failsafe would purportedly apply when the field worker is not available to relay the code. *See, e.g.*, '782 patent, 10:19–22, Fig. 13. In such an instance, "the code can be retrieved from the" dispatcher's device. '782 patent, 10:19–22. Caltrain counters that Railware has not demonstrated that the claims provide for such a failsafe. *See* ECF No. 173 at 7 (citing *Dynapass IP Holdings LLC v. Bank of Am. Corp.*, 2026 WL 1689580, at *2 (Fed. Cir. June 11, 2026)).

Ultimately, however, the Court need not decide for purposes of claim construction whether the claims include (or accommodate) a failsafe. The Court's construction leaves that question for another day. As a matter of first principles, it suffices to say that Railware's proposed construction would invite indefiniteness concerns because it injects a subjective term of degree ("readily"). *See Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1378 (Fed. Cir. 2017). It is also not entirely clear what "available" means. Railware's proposed construction would therefore likely



United States District Court
Northern District of California

confuse a jury and prompt wasteful line-drawing efforts.

But Caltrain's proposed construction, which requires absolute lack of knowledge in perpetuity, is also not tenable. That is because the claims and specification plainly contemplate a "manual" embodiment where the field worker manually relays the code to the dispatcher, at which time the dispatcher becomes privy to the code. *See, e.g.*, '835 patent, cl. 40 (teaching the "transmi[ssion] [of] the secret code to the remote user of the user terminal [(i.e., the dispatcher)]"); '782 patent, 8:21–27 ("[T]he railway traffic controller inputs the release code to remove the block on certain track sections"); *see also id.* at 8:40–45, 6:4–8, 10:15–19, 10:23–36.

Caltrain's proposed construction would result in what are at best awkward—and at worst contradictory—claims. For example, claim 1 of the '782 patent provides for the removal of a block "only upon receiving the release code . . . ." Again, under Caltrain's proposed construction, the release code would remain not known in perpetuity. But logically, a dispatcher cannot "receive" a code that is never known. *Cf.* ECF No. 155 at 14 ("Caltrain's construction would result in such a code transitioning from a 'release code' to something else, simply based upon the dispatcher obtaining the code . . . ."). Rather, the correct construction must recognize that the "unknown" status of the code can terminate.

The Court discussed its concerns about the proposed constructions with the parties at the hearing held on October 30, 2026. *See* ECF No. 201. There, Railware proposed a new construction: "[a] code for releasing a block on a track that is not available to the terminal user (i.e., the dispatcher) to release the block, but the code may become available if a releasing event occurs (e.g., the dispatcher receives the code from a railway field worker)." This proposed construction resolves the Court's concerns. It no longer modifies the word "available" with a term of degree (i.e., "readily"), and it also specifies what "available" means: the code is "available . . . ***to release the block***."

To the extent Caltrain protests that the Court's construction does not properly account for the subset of the "code" terms that refer to a ***secret*** code, that argument is unavailing. For one, Caltrain did not propose different constructions for any of the "code" terms. *See* ECF No. 173 at 4–5. Moreover, the claims and specification plainly contemplate that, at times, the dispatcher may become privy to even a secret code. *See, e.g.*, '115 patent, cl. 22; '835 patent, cl. 20, Fig. 13

(contemplating that the dispatcher can "receive [the] code via voice communications from" the field worker then "enter [the] ***secret*** code" (capitalization modified and emphasis added)).

For the foregoing reasons, the Court adopts the following construction for the "code" terms, as modified for each patent to match the different ways in which the patents refer to a "dispatcher": "A code for releasing a block on a track that is not available to the dispatcher to release the block, but the code may become available if a releasing event occurs (e.g., the dispatcher receives the code from a railway field worker)." The Court finds that Caltrain's indefiniteness argument is moot in light of the exclusion of "readily" from the Court's construction.

**B. "Second Secret Code"**

| Railware's Proposal | Caltrain's Proposal | Court's Construction |
|---|---|---|
| "A code relayed from the remote user terminal or the railway field worker."<br><br>Not indefinite. | "A second, new code."<br><br>Alternatively, it is indefinite. | "A code relayed from the remote user terminal or the railway field worker." |

Claim 20 of the '115 patent teaches a "secret code." Dependent claims 22, 23, 33, and 34 teach a "second secret code." Caltrain argues that the "second secret code" must refer to a "second, ***new*** code" because the term is introduced with an indefinite article. *See, e.g.*, '115 patent, claim 22 ("receive ***a*** second secret code"). On this score, the parties do not disagree. That the "secret code" and "second secret code" are two separate elements follows from basic claim drafting principles. *See WIMCO, LLC v. Lange Indus., Inc.*, 2007 WL 4461629, at *11 (D. Minn. Dec. 14, 2007) (quoting Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting* § 10:7.4 at 10–44 (2007) ("A new element or step is introduced with an indefinite article 'a' or 'an.'")). Indeed, Railware's proposed construction for the "second secret code" is different than its proposed construction for the "code" terms. *See supra* III.A. That reveals Railware is not arguing that the "second secret code" and "secret code" literally refer to the same ***element***.

But though the "secret code" and "second secret code" refer to different claim elements, those codes can "match," so to speak. The claims plainly contemplate as much. *See, e.g.*, '115 patent (teaching "determining that the second secret code and the secret code stored in the memory device are the same[]"). And Caltrain agrees: at the claim construction hearing, Caltrain clarified that it

was not suggesting that the second secret code could not match the stored code. *See also* ECF No. 173 ("[T]he comparison [between the codes] confirms a separately received code that may or may not match the stored code[] . . . .").

What the parties disagree over is whether the "second secret code" bears a "relationship" to the stored code. Railware says the answer is yes. *See* ECF No. 155 at 15. Namely, in Railware's view (and as described in the claims), the second secret code is the code relayed to the dispatcher to determine whether the second code matches the stored code (and if so, releasing the block). *See* ECF No. 155 at 15–16. Caltrain disagrees, arguing that "[n]o such relationship is claimed," that the '115 patent "does not describe where 'a second secret code' originate[s]," and that consequently, "[t]he second secret code is indefinite." ECF No. 173 at 14.

Caltrain's indefiniteness argument is unavailing, and it is not a close call. Caltrain mischaracterizes Railware's position, interpreting Railware's argument that there is a "relationship" between the "second secret code" and the stored code as contending that the second code and the stored code refer to the same element. *See, e.g.*, ECF No. 173 at 14 ("No such relationship is claimed, and if the worker was returning the same code, then there would be no need to compare the codes . . . ."). Again, as previously discussed, that is not Railware's position. Rather, Railware contends that the second and stored codes share a "relationship" insofar as the codes are compared to one another. *See* ECF No. 155 at 15–16.

The claims both confirm Railware's position that the codes share a "relationship" and forecloses Caltrain's indefiniteness argument. Claims 22, 23, 33, and 34 of the '115 patent expressly teach comparing the second secret code and the stored code to "determine" whether the codes "are the same." And the '115 patent's specification plainly contemplates that "the maintenance worker transmits the random secret code to the railway traffic control center" and that the received code is "check[ed]" against the code stored in memory. '115 patent, 10:39–50. Consequently, Caltrain's indefiniteness argument is unavailing; the '115 patent describes where the second secret code comes from (the field worker) and what it is used for (to compare to the code stored in memory). The '115 patent is clear as to how the codes are used and how they relate to one another. *Cf. Schmeisser GmbH v. AC-Unity*, 2026 WL 2198585, at *3 (Fed. Cir. July 30, 2026) ("[T]he district court itself

United States District Court
Northern District of California

. . . readily understood the scope of [the] . . . term. . . . This is all that definiteness requires.”).

For the foregoing reasons, the Court adopts the following construction for “second secret code”: “A code relayed from the remote user terminal or the railway field worker.”

### C. “User Terminal” / “Remote User Terminal”

| Railware’s Proposal | Caltrain’s Proposal | Court’s Construction |
|---|---|---|
| “User terminal of a railway field worker.” | “Railway field worker’s mobile user device.” | “User terminal of a railway field worker.” |

The parties agree that the “user terminal” belongs to (or is “of”) the railway field worker. But the parties dispute what the user terminal is. Railware argues that the term should be left as is because (1) the patents consistently refer to a “user terminal” rather than a “mobile user device; and (2) other claims expressly refer to a “mobile user device” such that Caltrain’s position would run contrary to claim differentiation principles. *See* ECF No. 115 at 17–18. Caltrain counters that “user terminal” should be construed to mean “mobile user device” because (1) that construction gives meaning to Railware’s statements in IPR proceedings that the user terminal is “in the field with” the field worker. *See* ECF No. 173 at 17 (quoting ECF Nos. 173-2 at 20, 173-12 ¶¶ 163, 165–66); (2) the specification describes the user terminal as “mobile”; and (3) Railware’s construction ignores the “remote” in “remote user terminal” by proposing the same construction for “user terminal” and “remote user terminal.” ECF No. 173 at 17–18.

The Court begins with the claims. The claims of all three asserted patents refer to a “user terminal” or “remote user terminal.” *See* ’782 patent, cls. 1; ’835 patent, cls. 1, 40; ’115 patent, cls. 1, 40. Only the method claims of the ’782 patent refer to a “mobile user device,” which, under principles of claim differentiation, suggests that “user terminal” does not mean the same thing as “mobile user device.” *See* ’782 patent, cls. 5–7.

The specifications do not, as Caltrain argues, countenance a different conclusion. The specification of the ’782 patent refers to “mobile” devices but only in the context of describing particular embodiments. *See* ’782 patent, 8:67–9:2 (“In the ***present embodiment*** being illustrated, the terminal [] is depicted as a mobile phone.” (emphasis added)). Indeed, the specification further provides that “[t]he terminal could be ***any*** communication device such as, but not limited to, mobile

phone or smartphone, tablet, WIC (or another) pager, PDA, etc." '782 patent, 9:2–5 (emphasis added). Far from limiting the user terminal to mobile devices, the patents envision that the user terminal can be ***any*** communication device.

Caltrain's remaining arguments are unavailing.

***First***, Railware's statements in an IPR proceeding are extrinsic evidence. And in any event, the statement that the user terminal is "in the field" with the field worker only describes *where* the user terminal is located (i.e., "in the field"); it does not mean that the user terminal must be a mobile device. *See* ECF No. 173-2 at 20.

***Second***, it is of no moment that Railware proposes the same construction for "user terminal" and "remote user terminal." Caltrain also appears to propose the same construction for both terms, to start. *See* ECF No. 173 at 17–18. More critically, the "remote" in "remote user terminal" appears to simply write out what is already obvious from the rest of the claim: that the user terminal is located "remotely" from the dispatcher. *See* ECF No. 155 at 15–16.

For the foregoing reasons, the Court adopts the following construction for "user terminal" and "remote user terminal": "User terminal of a railway field worker."

### D. "Railway Control Apparatus" / "Railway Traffic Control Apparatus"

| Railware's Proposal | Caltrain's Proposal | Court's Construction |
| --- | --- | --- |
| No construction necessary.<br><br>Alternatively: "An apparatus or collection of hardware and software components that controls a railway or railway traffic." | "Dispatcher terminal." | "A collection of hardware and software components that controls a railway or railway traffic." |

Railware argues that no construction is necessary because (1) the disputed terms are "non-technical such that it would be readily understood by a jury"; (2) "the claims themselves [already] define the features of . . . the apparatus"; and (3) the inventor "chose to use broad terms" and did not "act as his own lexicographer to narrow" the claims. *See* ECF No. 155 at 20–21 (citing *ActiveVideo Networks, Inc. v. Verizon Commc'n, Inc.*, 694 F.3d 1312, 1325–26 (Fed. Cir. 2012)). Alternatively, Railware puts forth a broad construction (see chart above) based on the specifications' references to "hardware and software components [] for controlling a railway or railway traffic."

*See* ECF No. 155 at 22.

Caltrain counters that the asserted patents "define[]" or "refer to" the "railway [traffic] control apparatus" as a "terminal." *See* ECF No. 173 at 18–19. Caltrain also argues that its proposed construction is proper because (1) "[t]he dispatcher's terminal is shown as a computer[]"; and (2) Railware's expert in another case concerning the same patents "testified that the railway control apparatus includes the same components as an "ordinary computer . . . with a keyboard, [] mouse, processor, storage, and display.'" *See* ECF No. 173 at 19.

None of Caltrain's arguments is convincing.

Caltrain's argument that the '115 patent "defines" a "railway traffic control apparatus" to mean "terminal" simultaneously misreads the specification and makes too much of it. *See* ECF No. 173 at 18–20. The relevant excerpt is as follows: "FIG. 1A shows schematically an exemplary embodiment in which a system 100A includes a railway traffic control *apparatus* (i.e., terminal) . . . ." '115 patent, 5:7–9 (original emphasis). At most, the word "apparatus"—and nothing more—is defined as a "terminal," not the railway traffic control apparatus as a whole. In any event, this excerpt expressly describes an "exemplary embodiment." *See* '115 patent, 5:7; *Teleflex, Inc. v. Ficose North Am. Corp.*, 299 F.3d 313, 1326 (Fed. Cir. 2002) ("[T]he claims must be read in view of the specification . . . but limitations from the specification are not to be read into the claims.").

Even if Caltrain is only arguing that "railway traffic control apparatus" should be understood to mean "railway traffic control ***terminal***," that is, in the Court's view, a distinction without a difference. *See* ECF No. 173 at 19. And that move still does not get Caltrain to its conclusion that the disputed terms mean "***dispatcher's*** terminal." Therefore, Caltrain's argument that "[t]he dispatcher's terminal is shown as a computer[]" is unconvincing. *See* ECF No. 173 at 19. And even if the Court were to credit the argument, Caltrain's excerpts only show that a dispatcher terminal can be a computer, not that it can ***only*** be a computer.

Caltrain in essence asks this Court to construe a nonce term in a way that unduly constricts claim scope. *Cf. Am. Fireglass v. Moderustic Inc.*, 2018 WL 2392816, at *6 (S.D. Cal. Apr. 16, 2018) ("[T]he word 'apparatus' is a 'nonce' word . . . ."). In the Court's view, substantive limitations defining the structure of the control apparatus and its functions derive from the rest of the claim, not



United States District Court
Northern District of California

the term itself. *Contra* ECF No. 173 at 20 ("'[R]ailway [traffic] control apparatus' is a separate phrase that must have a separate meaning from the numerous words thereafter[] . . . ."). Caltrain's concern that Railware's "proposed construction is boundless" is therefore unavailing. *See* ECF No. 173 at 19 (capitalization modified).

All told, Caltrain's "construction is confusing, unhelpful, adds no clarity to the claim language itself, and is erroneous to the extent it attempts to narrow the claims . . . ." *ActiveVideo*, 694 F.3d at 1325. Cognizant of its obligation to construe terms in a manner that resolves the parties' dispute, *see O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008), the Court adopts the following construction: "A collection of hardware and software components that controls a railway or railway traffic." This construction finds ample support in the specifications, which identify a plethora of software and hardware components comprising the railway control apparatus. *See, e.g.*, '782 patent, 5:40–6:17, 6:42–54.

**E. "A/The Processor"**

| Railware's Proposal | Caltrain's Proposal | Court's Construction |
|---|---|---|
| No construction necessary.<br><br>Alternatively: "One or more processors." | "The same single processor as previously referred to in the claim." | "One or more processors, at least one of which is configured to perform the recited functions" |

Railware argues that "a/the processor" means "one or more processors." *See* ECF No. 155 at 23–24. Caltrain contends that the "processor" must be a single processor. *See* ECF No. 173 at 21.

The default rule is that "the indefinite article 'a' means 'one or more' . . . ." *Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1315 (Fed. Cir. 2023) (cleaned up). The only exception is "where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule." *Id.* at 1315 (quoting *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed. Cir. 2008)); *see also KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). Here, "[n]othing in the claim language, specification, or prosecution history compels an exceptional reading of 'a [processor]'. . . ." *Baldwin*, 512 F.3d at 1343. In other words, the Court declines to construe the claims such that there can ***only*** be one processor.

But while the claims permit "more than a single [processor]"—that is, a system with two or three or four processors might still infringe the patents—"[s]ubsequent references" in the claims "to

the initial processor" that "further define[]" the processor's "functionality . . . . require that a ***single instance*** of the [processor] be capable of performing all the recited functionality." *Salazar*, 64 F.4th at 1316–17 (emphasis added); *Carrum Techs., LLC v. Ford Motor Co.*, 2025 WL 2924504, at *4 (Fed. Cir. Oct. 15, 2025) (holding, under similar circumstances, that the "context of the claim [] requires" that "at least one instantiation of [that element] must embody all of its recited functions"); *In re Varma*, 816 F.3d 1352, 1362–63 (Fed. Cir. 2016) (similar).

Here, all three patents teach "a processor." *See* '782 patent, cl. 1; '835 patent, cls. 1, 20, 40; '115 patent, cls. 20, 30–31. And all three patents also subsequently refer back to the processor and recite additional processor functionality. *See, e.g.*, '782 patent, cl. 1 ("the processor" places blocks, generates release codes, and removes blocks); '835 patent, cl. 1 (same); '115 patent, cl. 20 ("the processor" controls railway interlocks). Under Federal Circuit precedent, these circumstances require that "at least one of the one or more [processors] must perform each of its recited functions." *Carrum Techs.*, 2025 WL 2924504, at *4. The Court's construction stays faithful to Federal Circuit precedent and is substantially similar to the construction affirmed in *Salazar*. *See* 64 F.4th at 1314 (affirming the construction "one or more microprocessors, at least one of which is configured to perform the generating, creating, retrieving, and generating functions[]").

Railware's authorities are inapposite. Simply put, *Salazar* and its progeny clarified the circumstances under which a ***single*** instance of element (here, a processor) must perform all its recited functionality. *Compare Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016) (interpreting "a processor" to mean "one or more processors" where the claim "had no subsequent reference to "the" processor). So Railware's caselaw—all of which predate *Salazar*—are unavailing. *See* ECF Nos. 155 at 23, 183 at 14 (collecting cases). And to the extent Railware argues that subsequent references to "the processor" may refer to any one of the plurality of processors, the Federal Circuit rejected this precise argument in *Salazar*. *See* 64 F.4th at 1318 ("Mr. Salazar would have us read the phrase 'one or more' in the . . . construction to mean '*any one of the* one or more' when referring to the later recited functions. We decline to do so." (cleaned up and original emphases)).

Railware's contention that "there would be no technical differences between a multi-

processor system versus a 'single' processor system for purposes of implementing the inventions[]" is a doctrine-of-equivalents argument dressed up as claim construction. *See* ECF No. 155 at 24. And tellingly, Railware cites the specification—not the claims—for the proposition that the patents "clearly envision . . . systems . . . designed to work in a modular fashion." ECF No. 183 at 13–14. But "[c]ourts do not rewrite claims; instead, [they] give effect to the terms chosen by the patentee." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364–65 (Fed. Cir. 1999); *see also Texas Instruments Inc. v. International Trade Comm'n,* 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[C]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.").

For the foregoing reasons, and because the patents define their respective processors' functionalities differently, the Court adopts the following construction for "a/the processor": "One or more processors, at least one of which is configured to perform the recited functions."

### F. "Responsive To"

| Railware's Proposal | Caltrain's Proposal | Court's Construction |
|---|---|---|
| No construction necessary.<br><br>Alternatively: "In response to" | "Exclusively upon" | "As the but-for cause thereof," |

Claims 20–26, 30–36, and 41 of the '835 patent teach (or depend on claims that teach) an "apparatus" that, "***responsive*** to receiving the secret release code from the terminal, remove[s] the block from the one or more sections of railway track." Similarly, claims 22, 23, 33, and 34 of the '115 patent teach (or depend on claims that teach) an "apparatus" that, "***responsive*** to determining that the second secret code and the secret code stored in the memory device are the same, release[s] the block on the at least one selected track section."

Railware argues that the term "responsive to" is readily understood by a jury and hence needs no construction. *See* ECF No. 155 at 24. Alternatively, Railware contends that "in response to" is the correct construction[2] because (1) the disputed term "merely indicates a general order of operations" (2) the patents' use of the word "comprising" denotes open-ended claims; and (3)

[2] Railware's construction, the Court observes, is not much of a construction at all; Railware appears to be doubling down on its contention that no construction is necessary.

Federal Circuit precedent "permit[s] intervening steps" between an event that is "in response to" another event. *See* ECF No. 155 at 24–25 (citing '782 patent, 7:31–33; '825 patent, 7:33–37; '115 patent, 7:37–41; *Rideshare Displays, Inc. v. Squires*, 2025 WL 2751580, at *5 (Fed. Cir. Sept. 29, 2025)).

Caltrain counters that the term "responsive to" means "exclusively upon" because (1) receiving the code is the "but-for cause of unblocking the track"; (2) the claims do not merely denote an order of operations, but that a block is removed upon (a) receipt of the code (with respect to the '835 patent), or (b) upon verifying that the received code is correct (with respect to the '115 patent); and (3) Federal Circuit caselaw has construed "responsive to" to mean "but-for cause." *See* ECF No. 23–25 (citing *Centripetal Networks, LLC v. Cisco Sys.*, 2026 WL 1162800 (Fed. Cir. Apr. 29, 2026)).

The Court begins again with the claims. Both patents condition release (or removal) of a block on the occurrence of a specific event. Specifically, the '835 patent provides that the apparatus, "***responsive to*** receiving the secret release code from the terminal, remove[s] the block from the one or more sections of railway track." '835 patent, cls. 1–2 (emphasis added). And the '115 patent provides that the apparatus, "***responsive to*** determining that the second secret code and the secret code stored in the memory device are the same, release[s] the block on the at least one selected track section." '115 patent, cls. 22–23 (emphasis added).

The claims do not suggest—as Caltrain contends—that the release of a block is conditioned "exclusively upon" reception of the release code (for the '835 patent) or a successful code match (for the '115 patent). Rather, these events are the but-for cause of the release or removal of a block. *See Centripetal Networks*, 2026 WL 1162800, at *7–9 ("'[R]esponsive to' requires that the claimed signal be the but-for cause of 'ceasing processing' packets . . . .").

Nor do "but for" and "exclusively upon" mean the same thing. To be clear, an event can have more than one but-for cause. Running a red light might be the but-for cause of a car accident. But so is the driver's decision to drive that day. Caltrain would like the Court to hold that a first event "responsive to" a second event requires that the first event be the ***only*** but-for cause of the second event. The Court is not convinced. *See Centripetal Networks*, 2026 WL 1162800, at *9

(holding that "'responsive to' requires that the claim signal be ***the*** but-for cause"—not the ***only*** but-for cause—of 'ceasing processing' packets" (emphasis added)).

The "exclusively upon" language is also infirm because it precludes the occurrence of intervening events between reception of the release code (for the '835 patent) or a successful code match (for the '115 patent) and the release or removal of a block. *See* ECF No. 155 at 25. Like arguments have been rejected at the Federal Circuit. *See Rideshare Displays*, 2025 WL 2751580, at *5 ("Rideshare's argument supposes that there must be a direct relationship between the user's request and transmitting the signal. We disagree that the claims require a direct link and exclude a causal chain."); *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1056 (Fed. Cir. 2009) (similar). The specifications, which denote a sequence of causal events, also support the Court reading. *See, e.g.*, '782 patent, 7:33–37 ( "The release code is then input into the block remover l0lC. ***After which***, the block is removed and traffic to that section of rail is then allowed." (emphasis added)).

For the foregoing reasons, the Court adopts the following construction for "responsive to": "As the but-for cause thereof." *See Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1056 (Fed. Cir. 2009).

United States District Court
Northern District of California

## IV. ORDER

For the foregoing reasons, the Court adopts the following constructions:

| Term(s) | Court's Construction |
|---|---|
| "Release Code" | "A code for releasing a block on a track that is not available to the terminal user (i.e., dispatcher) to release the block, but the code may become available if a releasing event occurs (e.g., the dispatcher receives the code from a railway field worker)." |
| "Removal Code"<br>"Secret Release Code"<br>"Secret Removal Code" | "A code for releasing a block on a track that is not available to the user of the railway traffic control apparatus (i.e., dispatcher) to release the block, but the code may become available if a releasing event occurs (e.g., the dispatcher receives the code from a railway field worker)." |
| "Secret Code" | "A code for releasing a block on a track that is not available to the user of the railway control apparatus (i.e., dispatcher) to release the block, but the code may become available if a releasing event occurs (e.g., the dispatcher receives the code from a railway field worker)." |
| "Second Secret Code" | "A code relayed from the remote user terminal or the railway field worker." |
| "User Terminal"<br>"Remote User Terminal" | "User terminal of a railway field worker." |
| "Railway Control Apparatus"<br>"Railway Traffic Control Apparatus" | "A collection of hardware and software components that controls a railway or railway traffic." |
| "Processor" | "One or more processors, at least one of which is configured to perform the recited functions." |
| "Responsive To" | "As the but-for cause thereof," |

Dated: November 6, 2026

BETH LABSON FREEMAN
United States District Judge